UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                    Plaintiff,                          DECISION & ORDER and
                                                        REPORT & RECOMMENDATION

          v.                                            06-CR-6024L

ALGERNON TOOLE, a/k/a "AL"
EVERETTE TOOLE, a/k/a "E",

                    Defendants.

_____

## PRELIMINARY STATEMENT

          By Order of David G. Larimer, United States District Judge, dated September 5,

2006, all pretrial matters in the above-captioned case have been referred to this Court pursuant to

28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 51).

          Defendants Algernon and Everette Toole are charged in a two-count Second

Superseding Indictment.  Both counts charge that Algernon and Everette Toole conspired to

possess with intent to distribute and to distribute five kilograms or more of cocaine, in violation

of 21 U.S.C. § 846.  The conspiracy charged in Count One is alleged to have occurred between

August 2003 and September 2004.  The conspiracy charged in Count Two is alleged to have

occurred between January 30, 2006 and February 15, 2006.  (Docket # 60).

          Both defendants have filed pretrial motions seeking disclosure of the identity of

the government's confidential informants, suppression of statements and tangible evidence and

dismissal of the pending indictment.  (Docket ## 70, 71).  In addition, Everette Toole has moved

for severance, and Algernon Toole has moved to suppress a photographic identification and for

pretrial release.[1]  The following constitutes this Court's Decision and Order and Report and

Recommendation on defendants' pending motions.


## FACTUAL BACKGROUND

Evidentiary hearings relating to defendants' suppression motions were conducted

before this Court.  With respect to the motions brought by Algernon Toole, the government

offered testimony of Officer Matthew Naegele of the Willoughby Hills, Ohio Police Department

and Officer Philip Sindoni of the Rochester Police Department.  As to Everette Toole's motions,

the government offered testimony of Federal Bureau of Investigation ("FBI") Special Agents Eric

David Robinson, JoLana Faye Sonntag, Christopher T. Crocker, Michael J. Preisser, Ellie O.

Johnson, III, and Christopher Williams.  (Docket ## 113, 116, 118, 125, 126)[2].  No witnesses

were called by either defendant.  Based upon the credible testimony, this Court finds the

following.

---

[1]  Everette Toole's omnibus motions also sought an audibility hearing, a bill of particulars, *Brady* material, discovery and inspection, rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence, joinder of motions, *Jencks* material, disclosure of grand jury minutes and immediate disclosure of the government's witness list.  (Docket # 70).  Algernon Toole's omnibus motions also sought *Brady* material, a bill of particulars, rulings on evidentiary matters under Rules 404 and 609 of the Federal Rules of Evidence, disclosure of any criminal records for all potential government witnesses, a conspiracy hearing, *Jencks* material, notice pursuant to Rule 12(b)(4) of the Federal Rules of Criminal Procedure, an audibility hearing, suppression of wiretap evidence, discovery of grand jury proceedings, suppression of statements and tangible evidence, notice of any superseding indictment, severance, joinder of motions, and immediate identification of government witnesses.  Each of these requests was either resolved by the parties or decided in open court by the undersigned on January 5, 2007.  (Docket ## 77, 78, 79, 80).

[2]  The transcript of the June 5, 2007 hearing is hereinafter referenced as "Tr.A __."  (Docket # 113).
   The transcript of the June 15, 2007 hearing is hereinafter referenced as "Tr.B __."  (Docket # 116).
   The transcript of the July 20, 2007 hearing is hereinafter referenced as "Tr.C __."  (Docket # 118).
   The transcript of the July 9, 2007 hearing is hereinafter referenced as "Tr.D __."  (Docket # 125).
   The transcript of the August 29, 2007 hearing is hereinafter referenced as "Tr.E __."  (Docket # 126).

**Testimony Relating to Traffic Stop of Algernon Toole**:  On September 15, 2004, Matthew Naegele worked as a patrol officer in the Willoughby Hills, Ohio Police Department.  (Tr.A 8-9).  At the time, Naegele was part of the department's "Aggressive Criminal Enforcement" team, whose mission was to "aggressively enforc[e] traffic laws of the state of Ohio[,] while at the same time investigat[e] any criminal activity that may be occurring during the course of the traffic stops."  (Tr.A 10).  According to Naegele, officers like he, who are assigned to highway interdiction, are trained to "look[] beyond just the traffic ticket" and to "observ[e] clues of persons that may indicate that criminal activity could be occurring."  (Tr.A 11).

On September 15, 2004, Naegele was in a marked police vehicle monitoring westbound traffic on I-90, an interstate thruway.  (Tr.A 15).  At approximately 4:11 p.m., Naegele observed a blue Ford Taurus approach in the far left lane.  (Tr.A 17).  As the vehicle approached, it changed lanes and merged closely behind another vehicle traveling in the center lane.  (Tr.A 17).  According to Naegele, the Taurus followed the other car from an unsafe distance of only one and one-half to two car lengths at a speed of approximately 65 to 70 miles per hour.  (Tr.A 17, 18).  As the Taurus passed his police vehicle, Naegele observed that the driver had his hand raised to his face, effectively shielding it from Naegele, and that neither he nor the single passenger looked at Naegele.  (Tr.A 19).  Naegele entered the thruway and followed the Taurus for slightly more than one mile.  (Tr.A 20).  As he did so, the Taurus continued to follow the car ahead too closely and began to weave in and out of the center lane. (Tr.A 20).

3

Naegele activated his siren and overhead lights to signal the Taurus to pull over onto the shoulder of I-90.  (Tr.A 21-24; Tr.C 200; G.Exs. 12, 13).  The Taurus did so, and Naegele approached the passenger side of the vehicle, identified himself and announced that the car was being stopped for following too closely and weaving.[3]  (Tr.A 21-22).  According to Naegele, the driver, later identified as Algernon Toole ("Algernon"), and the passenger both responded nervously, avoiding making eye contact with him.  (Tr.A 22-23).  Naegele also observed that their hands were shaking and that their chests were beating rapidly.  (Tr.A 22-23).

Naegele asked Algernon for his driver's license, which he provided, along with a rental agreement for the vehicle.  (Tr.A 24).  As he did so, his hand continued to shake.  (Tr.A 25).  The rental agreement indicated that the car had been rented by Mariana Merpeden from Budget Rent A Car, Inc. (hereinafter "Budget").  (Tr.A 25; G.Ex. 1).  According to the agreement, the car had been rented at the Rochester, New York airport on September 14, 2004 and was due to be returned to that location on September 17, 2004.  The Budget agreement further provided, "No additional operators are authorized or permitted without Budget's prior written approval in accordance with the terms and conditions of the rental agreement or applicable state law."  (Tr.A 28).

Naegele asked Algernon who had rented the vehicle; Algernon pointed to the passenger, later identified as Eric Maldinado, who stated that his mother had actually rented the

---

[3]  Willoughby Hills Traffic Code § 331.09 provides in pertinent part, "The operator of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and condition of the highway."  (G.Ex. 12).

Willoughby Hills Traffic Code § 331.34 provides in pertinent part, "No person shall operate a vehicle in a weaving or zigzag course unless such irregular course is necessary for safe operation or in compliance with law."  (G.Ex. 13).

car for them.  (Tr.A 30).  Maldinado offered to call his mother, but Naegele declined the offer.

(Tr.A 121-22, 125).  Naegele asked Algernon and Maldinado about their plans, and Algernon

responded that they were traveling to Mississippi for his son's football game on September 17,

2004, and that they planned to stay in Mississippi for a week.  (Tr.A 30-31).  Naegele did not see

any luggage in the car, but did notice the presence of several fast food wrappers and several

cellular telephones, which "buzzed" frequently during the encounter.  (Tr.A 32).

Naegele returned to his patrol car to conduct a records check.  Using his radio, he

contacted a police department dispatcher and a representative of the El Paso Intelligence Center

("EPIC").[4]  (Tr.A 35-36).  The dispatcher reported that both Algernon and Maldinado had

previously been arrested for felony narcotics charges.  (Tr.A 36).  The EPIC representative

reported that Algernon was a suspected cocaine distributor in Rochester, New York and that in

2000 a vehicle registered to him had been seized near the Texas border, from which $88,000 had

been recovered.  (Tr.A 37-38).

Willoughby Hills Police Officer Randy Mullenax arrived to assist at about this

time.  Naegele asked Mullenax to contact Budget and inquire whether there were any additional

authorized operators for the rental vehicle.  (Tr.A 38).  Mullenax did so and reported that Budget

had stated that no additional operators were authorized and had requested that the car be towed.

(Tr.A 39).

At this point, Naegele asked Algernon to exit the car and move to the rear of the

vehicle.  Algernon appeared hesitant and nervous, but eventually got out of the car.  (Tr.A

---

[4] According to Naegele, EPIC is a government agency that maintains a database containing records relating
to, among other things, targets of federal, state and local narcotics investigations.  (Tr.A 35-36).

39-40). Naegele explained to him that the car was going to be towed and that Algernon would be

placed in the back seat of his patrol car and driven to the police station where he could arrange

for alternate transportation. (Tr.A 40-41). Naegele then asked him for permission to pat him

down, and Algernon responded that he just wanted to drive away. (Tr.A 41-42). Naegele

explained that the pat frisk was necessary for officer safety and again requested Algernon's

permission to perform the search, at which point Algernon turned around, extended his arms and

submitted to a pat search. (Tr.A 42). According to Naegele, the pat search was mandated by

Willoughby Hills Police Department policies and procedures in order to ensure that individuals

seated in the back seats of patrol cars are not armed. (Tr.A 42-43, 134-35).

During the pat frisk, Naegele felt a large bulge in Algernon's right front pants

pocket. From where he stood, he observed a "small brick" of money protruding from the pocket.

At this point, Naegele advised Algernon of his *Miranda* rights. (Tr.A 43, 45). Naegele then

asked him, "What is that," to which Algernon replied, "Nothing." (Tr.A 44). Naegele continued,

"What do you mean nothing," and Algernon responded that he wanted to talk to his attorney and

handed Naegele an attorney's business card. (Tr.A 44). The conversation then ceased. (Tr.A

44-45).

Naegele removed the money from Algernon's pocket and thereafter questioned

Maldinado whether he had any personal items in the Taurus. Maldinado indicated that he had a

duffle bag, but was unable to describe the bag. (Tr.A 49). Naegele asked him whether narcotics

were in the vehicle, and Maldinado responded, "No." Naegele then asked Maldinado whether

any large quantities of currency were inside the Taurus, and Maldinado laughed out loud, stating,

"Oh, no, no." (Tr.A 49). He too was pat searched, and approximately $5,000 in cash was taken from him. (Tr.A 49-50).

Following the discovery of the currency, a narcotics canine unit was called to the scene and directed to inspect the Taurus. The dog alerted to several locations on the car, indicating that it detected the odor of narcotics inside the Taurus. (Tr.A 52-53). Following the canine inspection, Naegele opened the trunk and began to remove the items inside. (Tr.A 157). When one of the other officers informed him that they intended to apply for a warrant to search the car, Naegele returned the items to the trunk and closed it. (Tr.A 157).

Naegele advised Algernon that the dog had alerted to the car and that the car would be towed to the police station, pending application for a warrant. Algernon responded that there were no narcotics in the vehicle and that the officers were not authorized to search the vehicle. (Tr.A 54). Naegele asked Algernon whether there were any items in the Taurus that did not belong to him, and he replied by repeating that the police were not permitted to search the car. (Tr.A 55).

After approximately forty to forty-five minutes, the towing company arrived and towed the Taurus to the Willoughby Hills Police Department station house. (Tr.A 55). Naegele transported Algernon to the station, while Mullenax transported Maldinado in his car. (Tr.A 55). They arrived at the station at approximately 5:37 p.m., and both were placed in an interview room, commonly referred to as the "prisoner release room." The room was located in a locked area of the police station. Algernon was permitted to use a telephone to contact his attorney. (Tr.A 56-58, 146).

After Algernon and Maldinado were seated in the interview room, Naegele began to draft the search warrant application – a process which took slightly less than three hours.  He presented the warrant application to Willoughby Hills Municipal Court Judge Larry Allen, who signed the warrant authorizing the search of the Taurus.  (Tr.A 59-60; Tr.C 206-07; G.Ex. 14).  Naegele returned to the station, where the search commenced at approximately 9:15 p.m.  (Tr.A 59-60; Tr.C 202-04, 208).  During the search, the officers removed a black duffle bag and blue bag from the trunk, inside of which officers found approximately $42,000.  (Tr.A 61-62).  After counting the money, Naegele completed an itemized receipt for the currency.  (Tr.A 63-64).

Following the search, all of the property taken from the car, other than the money, was laid out on the floor in the police station.  Maldinado and Algernon were permitted to view the property separately and to claim their items.  (Tr.A 65-66).  During this process, Naegele asked Algernon various pedigree questions in order to complete an inventory receipt listing the articles returned to him.  (Tr.A 67; G.Ex. 5, 7).[5]  In addition to the receipt for the articles removed from the luggage, Algernon also signed another receipt acknowledging the seizure of $7,960 from his person.  (Tr.A 71-72, 150; G.Ex. 6).  Algernon and Maldinado were then released from police custody and provided transportation to a hotel.  (Tr.A 72-73).  Before releasing Algernon, Naegele completed and issued to him a traffic citation for following too closely in violation of Willoughby Hills Ordinance § 331.09, which he had begun to prepare at the scene of the traffic stop.  (Tr.A 73; G.Ex. 2).

---

[5]  Algernon's review of the property and the creation of the receipt were captured on videotape.  That videotape was presented by the government during the June 5, 2007 suppression hearing.  (Tr.A 69; G.Ex. 7).

Naegele testified that he made a decision to impound the Ford Taurus following his determination that neither Algernon nor Maldinado were authorized to drive the vehicle. (Tr.C 209).  In order to effect the impoundment, he called the towing company to tow the car from the scene.  Had the subsequent decision to seek a search warrant for the vehicle not been reached, Naegele testified, he would have inventoried the contents of the vehicle, including the contents of the bags in the trunk, before the vehicle was towed.  He explained that he would have performed such an inventory search to comply with Willoughby Hills Police Department written policies and procedures, copies of which were introduced in evidence, which are designed to protect both the towing company and the police department against claims of loss or theft.  (Tr.C 213-19, 223; G.Ex. 16).

**Testimony Relating to Identification of Algernon Toole:**  Philip Sindoni, an investigator with the Rochester Police Department, testified that on November 23, 2004, he and FBI Special Agent Jason Fickett met with a confidential informant as part of an investigation into alleged narcotics trafficking by Algernon Toole.  (Tr.A 171-72).  The purpose of the meeting was to debrief the informant concerning Algernon and to conduct a photographic identification procedure.  (Tr.A 174-75).  Following some initial questioning, Sindoni presented the informant with a six-photograph array and asked him whether he recognized any of the individuals depicted.  (Tr.A 176, 187).  Within ten seconds, the informant pointed to the second photograph position and stated, "That's Al."  (Tr.A 177).  The informant then circled the photograph of "Al" and wrote his initials.  (Tr.A 177).  Sindoni and Fickett also signed and dated the array.  (Tr.A 178, G.Ex. 8).

9

According to Sindoni, neither he nor Fickett indicated or suggested to the informant that Algernon Toole's photograph was contained within the array. The informant also was presented with another photographic array, but no additional photographs of Algernon were shown to the informant. (Tr.A 181, 183, 189-90).

**Testimony Relating to Arrest of Everette Toole:** Various FBI agents testified about events that occurred in January and February 2006 that culminated in defendant Everette Toole's arrest. (Tr.B 5-6; Tr.D 163). He seeks suppression of evidence seized at the time of his arrest and statements made by him following his arrest.

On January 30, 2006, under the direction of investigating agents, a confidential source ("CS") telephoned Heather Wiesensel, the mother of two of Algernon's children, seeking to contact Algernon. Investigators did not know where Algernon was living at the time, although they believed he was living somewhere in Indiana. (Tr.D 165-66). During subsequent conversations with Wiesensel, the CS indicated that he[6] wanted to purchase five to seven kilograms of cocaine and hoped that Algernon could arrange for the transaction to occur in Chicago. (Tr.D 167). Wiesensel agreed to arrange the deal with Algernon. (Tr.D 167).

About two weeks later, on February 11, 2006, Wiesensel telephoned the CS to ask him to meet with Algernon and her at the Courtyard Marriott on Ridge Road. (Tr.D 167). Following the call, the CS was outfitted with a concealed recording device and went to the hotel. (Tr.D 168). During the meeting with Algernon and Wiesensel, the CS advised Algernon that he

---

[6] The government has not confirmed the gender of the confidential informant. For ease of reference, however, this Court will refer to the CS using the male pronoun.

had $90,000 and expected to receive an additional $60,000 the following day with which he wanted to purchase the narcotics.  The CS and Algernon discussed that the price per kilogram of cocaine would be $23,000.  (Tr.D 171-72).  Algernon told the CS that "E" would supply the cocaine; based upon previous drug transactions, the CS knew "E" to be a nickname for Everette Toole ("Everette").  (Tr.D 173-74).

The parties met again the next evening to further discuss the arrangements.  (Tr.D 174).  Among other things, they discussed driving to Chicago; Algernon recommended to the CS that he drive at night so as to avoid detection by law enforcement.  (Tr.D 175-76).  The CS advised that as soon as he received the balance of the money, which he expected to receive within the hour, he would be ready to depart.

After the meeting, the CS, Investigator Sindoni and Agents Preisser and Fickett drove to Chicago.  Sindoni planned to accompany the CS to the transaction in an undercover capacity, representing himself as the CS's cousin.  (Tr.D 177).

The next day, on February 13, 2006, after a series of calls between the CS, Wiesensel and Algernon (Tr.D 181, 185-86), a meeting was arranged between the CS and Everette in Room 313 of the Comfort Suites in Lansing, Illinois.  (Tr.B 6-8; Tr.C 186-87).  A closed circuit surveillance system had been installed in the room in order to enable agents to monitor the meeting from an adjoining room.  (Tr.D 187).  At approximately 5:31 p.m., one of the surveilling agents reported the arrival in the hotel parking lot of a silver Dodge Magnum registered to Frances Gray Toole.  (Tr.B 11, 62, 107-08; Tr.E 275).  Agents observed a man later identified as Everette, exit the Magnum and enter the hotel.  (Tr.B 11-13, 62, 110, 112; Tr.D 143, 190; Tr.E 277).

Everette proceeded to Room 313 and knocked on the door.  The CS answered the door and greeted Everette as "E."  (Tr.D 190).  The CS introduced Everette to Sindoni, indicating that Sindoni was his cousin.  (Tr.D 190).  They then discussed the price per kilogram of cocaine ($23,000), and Everette explained that "things were scarce" in Chicago at that time.  (Tr.D 190-91).

At that point, Everette and the CS stepped outside the hotel room, and Everette expressed his discomfort discussing the transaction in Sindoni's presence.  (Tr.D 192).  The CS returned to the room, explained Everette's concerns to Sindoni and Sindoni left the room.  At that point, Everette reentered the room and attempted to persuade the CS to provide him with the full amount of the purchase price so that the sale could take place in a single transaction.  The CS resisted, explaining to Everette that a substantial portion of the money belonged to his cousin (Sindoni), who was uncomfortable relinquishing the money before receiving the cocaine.  (Tr.D 193, 197).  Unable to resolve the issue, at approximately 5:56 p.m., Everette exited the hotel, returned to his vehicle and drove away.  (Tr.B 11-13, 62, 110, 112; Tr.D 143; Tr.E 281).

That night and the following day, the CS, Wiesensel and Algernon had many telephone conversations to discuss the manner in which the sale would occur.  (Tr.D 198-209).  They eventually agreed that the CS would purchase one kilogram first, after which the CS would provide Everette with the remainder of the purchase price.  (Tr.D 205-09).  The agents planned to arrest Everette after his receipt of the balance of the money.  (Tr.D 202).

The next day, on February 15, 2006 at approximately 4:00 p.m., Everette called the CS to say that he was on his way to the hotel.  (Tr.D 210).  At approximately 4:57 p.m., surveillance agents observed Everette drive into the hotel parking lot in the Dodge Magnum.

12

(Tr.B 17-18, 64).  After he parked, Everette telephoned the CS and told him to come to the

parking lot.  (Tr.D 213).  The agents provided the CS with $23,000 (the purchase price for one

kilogram), equipped him with a body recorder and the CS walked to the parking lot and entered

Everette's car.  Agents observed him exit Everette's car a short time later.  The CS promptly

reported that when they were in the car, the CS had provided Everette with the buy money and

Everette had advised that it would take him about forty minutes to retrieve the cocaine from his

supplier.  (Tr.D 213; Tr.B 18, 65).  Following this conversation, the CS exited the vehicle and

returned to the hotel, and Everette drove away.  (Tr.B 18-19, 65).

       At approximately 6:27 p.m., the Magnum returned to the hotel parking lot, and the

CS again walked to the parking lot and met with Everette in his vehicle.  (Tr.B 19; Tr.D 215-16).

After the CS got in, Everette began to drive around the vicinity of the hotel.  (Tr.D 216).  This

lasted approximately fifteen minutes, after which Everette returned to the hotel parking lot.  The

CS exited the car and entered the hotel, as Everette waited in the car.  (Tr.B 19; Tr.D 217).  The

CS reported that Everette had given him one kilogram of cocaine, and he provided the kilogram

to one of the investigating agents.  (Tr.D 217).

       The agents then provided the CS with a canvas bag containing $125,000 in "flash

money" and instructed him to return to Everette's car, show him the money and discuss the

purchase of the additional kilograms.  The CS was further instructed that at the conclusion of the

conversation, he should exit the car, leaving the flash money with Everette.  At that point, agents

planned to arrest Everette.  (Tr.B 21, 51; Tr.D 217-219; Tr.E 285).

       As planned, the CS exited the hotel and entered Everette's vehicle with the canvas

bag of money; after observing the CS get out of Everette's car, agents surrounded the car and

13

arrested Everette.  (Tr.B 21-23, 69, 118-19; Tr.D 220-21; Tr.E 286-87).  The agents ordered him

to exit the car, and he was placed on the ground, handcuffed and searched.  (Tr.B 118-21; Tr.E

287-88).  His wallet was removed from his pocket, and a cellular telephone was removed from

his hands.  (Tr.B 118-21; Tr.E 287-88).

Agent Robinson exited the hotel and observed, through the Magnum's open

doors, the canvas bag on the floor of the passenger's side.  (Tr.B 23-24).  Robinson retrieved the

bag, after which other agents conducted a more thorough search of the vehicle.  (Tr.B 24, 122;

Tr.D 222-23, 289; Tr.E 302-303).  During the search, a cell phone was recovered from the center

console, the keys were removed from the ignition and the registration was taken out of the glove

box.  (Tr.D 153-54).

Agent Christopher Williams testified that because the Magnum had been used as

an instrument of the narcotics transaction, he and supervising agents decided to seize the vehicle

in anticipation of an asset forfeiture proceeding.  (Tr.E 302).  Williams was advised by other

agents that nothing of value had been discovered in the car, and he thereafter locked the car and

left it in the parking lot.  (Tr.E 301).  Williams further testified that had the car not been

searched, he would have conducted an inventory search of the interior of the vehicle and

removed the bag containing $125,000 before securing the car for the night.[7]

Meanwhile, other agents escorted Everette to a hotel room, where he was seated

on a couch, his handcuffs were removed and he was offered a drink and the use of the restroom.

---

[7] The Dodge Magnum was taken to the FBI building and returned to its owner, Everette's wife, sometime later that month.  (Tr.E 306-308).  Before it was released to her, Williams and another agent performed an inventory search of the vehicle, in accordance with standard FBI policies and procedures, in order to document the condition of the vehicle and record all items located inside.  (Tr.D 145-48; Tr.E 309-310).

(Tr.B 25).  The agents instructed Everette not to say anything at that time and informed him that he was the subject of a long-term federal investigation.  (Tr.B 26-27; Tr.D 223).  They further indicated that if he were to cooperate, he might be able to go home that night and that, in any event, his cooperation would be brought to the attention of the prosecutor and judge.  (Tr.D 225).  Preisser stated that he could not make any promises about what would happen as he did not have the authority to make such determinations himself.  (Tr.D 225-26).

Agent Robinson questioned Everette about his educational background and language facility, and Everette replied that he had a high school education and could read and write.  Robinson advised Everette of his *Miranda* rights.  (Tr.B 29, 71; Tr.D 227; G.Ex. 8).  As he read the rights form, Robinson asked Everette to initial each line to indicate his understanding and to read one of the lines aloud to demonstrate his reading ability.  (Tr.B 29).  At approximately 7:26 p.m., Everette signed the *Miranda* rights and waiver form and indicated that he wanted to waive his rights and speak with the agents.  (Tr.B 32-33; G.Ex. 8).  According to Robinson, Everette appeared calm and did not behave in an intoxicated manner.  (Tr.B 28-29).  No threats or promises were made to Everette in order to induce him to speak, and he never indicated that he wished to cease answering questions or to speak with an attorney.  (Tr.B 33; Tr.D 227).

**DECISION AND ORDER**

Before this Court for Decision and Order are defendants' motions for disclosure of the government's confidential informants.  Also before the Court is Everette Toole's motion for severance.

15

## I.  Disclosure of Confidential Informants

Both defendants have moved for disclosure of the identities of the government's cooperating witnesses and confidential informants.  (Docket ## 70, 71).  During oral argument conducted on January 5, 2007, this Court denied defendants' motions with regard to informants relating to Count Two of the Second Superseding Indictment, but reserved decision with regard to informants relating to Count One.  (Docket ## 77, 78, 80).  The Court further directed counsel for the government to file an *ex parte* submission identifying any confidential informants the government intends to call at trial relating to Count One, summarizing such witnesses' anticipated testimony and describing the discovery materials relating to Count One that have been disclosed to the defense.  The government filed the requested materials under seal on January 30, 2007.  (Docket # 89).  For the following reasons, defendants' motions are denied.

The disclosure of a confidential informant's identity is within the sound discretion of the district court.  *DiBlasio v. Keane*, 932 F.2d 1038, 1042 (2d Cir. 1991).  The government generally is not required to disclose the identity of confidential informants.  *Roviaro v. United States*, 353 U.S. 53, 59 (1957).  In order to obtain such disclosure, the defendant must show that without it, he "will be deprived of a fair trial."  *United States v. Fields*, 113 F.3d 313, 324 (2d Cir.), *cert. denied*, 522 U.S. 976 (1997); *United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988) (defendant entitled to identity of confidential informant only upon showing that it is essential or material to the defense), *cert. denied*, 489 U.S. 1089 (1989).  A defendant's mere suggestion that disclosure will be of assistance to the defense of the case is insufficient.  *United States v. Fields*, 113 F.3d at 324.  "[T]he district court must be satisfied, after balancing the competing interests of the government and the defense, that the defendant's need for disclosure

16

outweighs the government's interest in shielding the informant's identity." *Id.* (citing *Roviaro v. United States*, 353 U.S. at 62). Such a need is established, according to the Second Circuit, "where the informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence." *United States v. Saa*, 859 F.2d at 1073.

In the instant matter, defendants have failed to show how disclosure of the informants' identities will be essential to their defense. *See United States v. Flaharty*, 295 F.3d 182, 202 (2d Cir. 2002) ("speculation that disclosure of the informant's identity will be of assistance is not sufficient to meet the defendant's burden"). Nor have any of the arguments advanced by defendants demonstrated the materiality of the informants' identities to their defense.

Based upon the voluminous discovery provided by the government, the nature of the prosecution against the defendants is far from unclear. In addition, the criminal complaint initially filed in this matter, as well as the extensive testimony elicited during the several evidentiary hearings, provide significant detail concerning the government's case against the defendants. The government's *ex parte* submission also makes clear that the government has produced documentary evidence relating to traffic stops involving defendants and their alleged co-conspirators, tape recordings of both defendants discussing drug activity and phone records relating to Algernon and other conspirators, further revealing the nature and scope of the government's evidence against the defendants. On this record, I find that the government's need to protect the safety of the informants outweighs any benefit that early disclosure of the

cooperating informants' identities may provide.  Thus, defendants' motions for disclosure of the

identities of the government's confidential informants are denied.


## II.  <u>Severance</u>

Also before the Court is Everette's request that his trial be severed from the trial

of his brother.  The Federal Rules of Criminal Procedure provide that an indictment or

information may charge two or more defendants "if they are alleged to have participated in the

same act or transaction, or in the same series of acts or transactions, constituting an offense or

offenses."  Fed. R. Crim. P. 8(b).  Relief from joinder is available, however, "if the joinder of

offenses or defendants in an indictment . . . appears to prejudice a defendant or the government."

Fed. R. Crim. P. 14(a).  Specifically, that rule affords the court discretion to "order separate trials

of counts, sever the defendants' trials, or provide any other relief that justice requires."  *Id.*

In order to obtain severance, a defendant must demonstrate "substantial

prejudice," *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991), that is, prejudice

"sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple

lengthy trials."  *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998).  *See also United*

*States v. O'Bryant*, 998 F.2d 21, 25 (1st Cir. 1993) (requiring "strong showing of evident

prejudice").

As a general matter, the interests of convenience, economy and efficient

administration of justice favor the joinder of trials, "especially when the underlying crime

involves a common plan or scheme and defendants have been jointly indicted."  *United States v.*

*Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991); *see also United States v. Crisona*, 271 F. Supp.

18

150, 154 (S.D.N.Y. 1967). The burden is on the defendant to show that he would be so prejudiced by a joint trial that he would effectively be denied a fair trial in a joint proceeding. *United States v. Burke*, 700 F.2d 70, 83 (2d Cir.), *cert. denied*, 464 U.S. 816 (1983).

As already noted, the indictment in this case charges that Algernon and Everette conspired to commit narcotics trafficking offenses. (Docket # 60). The evidentiary hearing relating to Everette's motion to suppress reveals substantial overlap in the government's evidence against both defendants on Count Two. On this record, I find that Everette has failed to demonstrate how a joint trial with his brother would cause him substantial prejudice, and I deny his motion for severance.

## REPORT AND RECOMMENDATION

Before this Court for Report and Recommendation are motions by both defendants to dismiss the Second Superseding Indictment on several grounds and separate motions filed by each to suppress evidence. (Docket ## 70, 71).

## I.  Algernon Toole's Motions to Suppress

Algernon moves to suppress all evidence seized pursuant to the traffic stop of the Ford Taurus in Willoughby Hills, Ohio on September 15, 2004. He also seeks to suppress all statements made by him to the Willoughby Hills police officers during that encounter. Finally, he moves to suppress evidence of the photographic identification conducted November 23, 2004. (Docket ## 71, 119).

A.  **Seizure of United States Currency:**  Algernon argues that the currency

seized from his pocket and from the trunk of the Ford Taurus should be suppressed because the

traffic stop was unsupported by reasonable suspicion.[8]  (Docket ## 71, 119).  As an initial matter,

this Court must consider the lawfulness of the traffic stop by Officer Naegele.  If the Court finds

that the stop was justified, it must next consider whether the length of the investigative detention

was reasonable, and if so, whether the pat frisk of Algernon and the seizure of currency from his

pocket was justified.  Finally, the Court must consider the legality of the seizure of the currency

found in the trunk of the Taurus.

1.  **Initial Traffic Stop:**  According to the Second Circuit, an ordinary

traffic stop constitutes a limited seizure within the meaning of the Fourth Amendment.  *United*

*States v. Scopo*, 19 F.3d 777, 781 (2d Cir.) (citing *Delaware v. Prouse*, 440 U.S. 648, 653

(1979)), *cert. denied*, 513 U.S. 877 (1994).  A traffic stop must be justified by probable cause or

"reasonable suspicion, based on specific and articulable facts, of unlawful conduct."  *Id.* (quoting

*United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993), *cert. denied*, 511 U.S. 1006 (1994));

*see Terry v. Ohio*, 392 U.S. 1, 30 (1968) (police officer may lawfully conduct brief stop and frisk

---

[8]  The government contends that Algernon lacks standing to challenge the seizure of currency from the trunk of the Ford Taurus – a rental car that he was not authorized to drive.  Even if Algernon lacks standing to challenge a search of the trunk, the currency was actually discovered inside bags located in the trunk of the vehicle. The government does not contest that the bags were Algernon's personal property, but disputes that he had a reasonable expectation of privacy in them.  *Compare United States v. Edwards*, 242 F.3d 928, 937 (10th Cir. 2001) (finding defendant had standing to challenge search of his bags contained in trunk of rental car rented by his companion) *with United States v. Wellons*, 32 F.3d 117, 119 (4th Cir. 1994) (reaching opposite conclusion), *cert. denied*, 513 U.S. 1157 (1995).  *See also United States v. Ross*, 456 U.S. 798, 822 (1982) (Fourth Amendment forecloses distinction between "worthy" and "unworthy" containers; "a traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf [may] claim an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attache case"); *United States v. Knoll*, 16 F.3d 1313, 1321 (2d Cir.) (reasonable expectation of privacy exists in closed containers), *cert. denied*, 513 U.S. 1015 (1994).  As explained *infra*, whether or not Algernon had a protectible interest in the contents of the bags, I conclude that the currency was lawfully seized.

for weapons, without probable cause, if officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot"); *see also Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (routine traffic stop is more analogous to *Terry* stop than to formal arrest).  Evidence obtained as the result of an unjustified traffic stop "is subject to the fruit of the poisonous tree doctrine" and may be suppressed.  *United States v. Scopo*, 19 F.3d at 781 (citing *United States v. Hassan El*, 5 F.3d at 729); *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

On a motion to suppress, a defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure.  *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980) (citations omitted), *cert. denied*, 450 U.S. 917 (1981); *United States v. Chavis,* 48 F.3d 871, 872 (5th Cir.1995); *United States v. Bayless*, 921 F. Supp. 211, 213 (S.D.N.Y. 1996).  Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence, *id.* at 213, that the search or seizure did not violate the Fourth Amendment.  *United States v. Arboleda*, 633 F.2d at 989; *see also United States v. Bonilla Romero*, 836 F.2d 39, 45 (1st Cir. 1987) ("[w]hen it has acted without a warrant, the ultimate burden of persuasion is then upon the government to show that its evidence is not tainted") (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)), *cert. denied*, 488 U.S. 817 (1988).

Here, Naegele testified that he conducted a traffic stop of the Ford Taurus that Algernon was driving.  Thus, the government bears the burden of establishing that the traffic stop was supported by probable cause or reasonable suspicion.  I find that this burden has been satisfied.

According to Naegele's testimony, while monitoring traffic from the median on the I-90 thruway, he observed a blue Ford Taurus driving in the far left lane. (Tr.A 15-17). As the vehicle approached Naegele's position, it performed a lane change and merged closely behind another vehicle traveling in the center lane. (Tr.A 17). For over a mile, the Taurus continued to travel at an unsafe distance behind the car in front of it. Naegele also observed the Taurus weaving in and out of the center lane. (Tr.A 20). Naegele testified that the Taurus's actions violated the Willoughby Hills Traffic Code for following too closely (§ 331.09) and weaving (§ 331.34).

Even without more, the above facts established probable cause for the traffic stop. *See*, *e.g.*, *Wren v. United States*, 517 U.S. 806, 809-10 (1996) ("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"); *United States v. Harrell*, 268 F.3d 141, 148-49 (2d Cir. 2001) (officer's observations that car had defective brake light and impermissibly tinted windows justified traffic stop); *United States v. Dhinsa*, 171 F.3d 721, 725 (2d Cir. 1998) (vehicle's failure to signal lane change sufficient justification for traffic stop); *Scopo*, 19 F.3d 777, 782 (2d Cir.) ("[w]hen an officer observes a traffic offense – however minor– he has probable cause to stop the driver of the vehicle") (internal quotation omitted), *cert. denied*, 513 U.S. 877 (1994); *United States v. Fernandez-Jimenez*, 2004 WL 1598653, *3 (S.D.N.Y. 2004) (officers' observation that vehicle turned without using turn signal justified traffic stop); *see also* Willoughby Hills Traffic Code § 331.09 ("The operator of a motor vehicle shall not follow another vehicle more closely than is reasonable") and § 331.34 ("No person shall operate a vehicle in a weaving or zigzag course").

22

Accordingly, I conclude that the government has established probable cause to support the initial traffic stop of the Ford Taurus.

        **2. Investigative Detention:** Having found that Naegele was justified in conducting the initial traffic stop of the Ford Taurus, the next question is whether the continued detention of Algernon and Maldinado following the initial stop exceeded the scope of a permissible stop. The lawfulness of an investigative stop involves a two-part inquiry. First, as discussed above, the police officer must have "reasonable suspicion" that the suspect has committed or is about to commit a crime. *Terry v. Ohio*, 392 U.S. at 20-23. Second, the court must consider the length of the detention, which "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see United States v. Sharpe*, 470 U.S. 675 (1985). In other words, an investigative stop may not continue indefinitely; at some point, such a stop ceases to be investigative and becomes a *de facto* arrest. *United States v. Sharpe*, 470 U.S. at 685.

        The Supreme Court has declined to delineate a "bright line" time limit beyond which an investigative stop will be considered unreasonable. *Id.* Rather, "common sense and ordinary human experience" must inform that determination, illuminated by a recognition that "[i]f the purpose underlying a *Terry* stop – investigating possible criminal activity – is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* []." *Id.* at 685-86 (quoting *Michigan v. Summers*, 452 U.S. 692, 700, n.12. (1981)).

        Among the factors the court should consider in evaluating the reasonableness of the length of an investigative stop are "whether the police diligently pursued a means of

investigation that was likely to confirm or dispel their suspicions quickly, [and whether] it was necessary to detain the defendant [during that period]." *Id.* at 686 (citing *Michigan v. Summers*, 452 U.S. at 701, n. 14). Particular attention should be paid to whether the situation confronted by the police was quickly-evolving; if so, the court should refrain from "unrealistic second-guessing." *Id.* Where the nature of the crime being investigated is serious and the likelihood of the detainee's involvement is apparent, a longer period of detention may be warranted. *United States v. Oates*, 560 F.2d 45, 59 (2d Cir. 1977) ("when the police officer knows or suspects that an offense with serious societal consequences is being committed and there is some reasonable possibility that the person he detains is involved, a more substantial detention is justified").

In this case, as described above, Naegele's observations led to the lawful traffic stop of the Taurus. While performing the stop, Naegele became suspicious about the occupants' activities. That suspicion arose from his observations of their behavior, his examination of the rental agreement and Algernon's statements about their plans. For example, he noticed that both individuals in the car avoided making eye contact with him and that their hands were shaking and their chests were beating rapidly. (Tr.A 22). In addition, the agreement revealed that the car had been rented by Mariana Merpeden, who was not present in the car, that no additional drivers were authorized to operate the car and that the car was to be returned two days later to the Rochester, New York location from which it had been rented. (Tr.A 25, 28; G.Ex. 1). Notwithstanding that obligation, Algernon stated that they were traveling to Mississippi, where they planned to stay for a week. (Tr.A 30-31). Naegele also took note of the absence of any luggage in the passenger compartment, but the presence of multiple cellular telephones that "buzzed" throughout the encounter. (Tr.A 32-33). Finally, Naegele's records check revealed

that both Algernon and Maldinado had been previously arrested on felony narcotics charges and that a car registered to Algernon had been seized near the Texas border several years earlier and had been found to contain $88,000.  (Tr.A 36-38).  Mullenax's call to the rental company confirmed that neither Algernon nor Maldinado were authorized to drive the car and that Budget wanted the car to be towed to the police station.  (Tr.A 38-39).

I easily conclude that Naegele's decision to detain Algernon during the ten to fifteen minute period described above (Tr.A 131, 141) – in order to determine whether he was authorized to operate the rental car – was within the scope of a lawful traffic or *Terry* stop.  *See United States v. Sparks*, 2004 WL 307304, *5 (S.D.N.Y. 2004) (during traffic stop, officer is permitted to make inquires relating to driver's license and registration and destination and purpose of trip).

I further find that Algernon's continued detention during the ensuing hour was likewise lawful.  During this period, Algernon was detained in the rear of Naegele's patrol car while awaiting the arrival of the towing company.  As Naegele explained to Algernon, he determined to detain him and transport him to the station house because Algernon had no means of transportation from the highway and it was not lawful to permit him to walk on the shoulder of the interstate.  (Tr.A 162-63).

I further reject Algernon's challenge to the lawfulness of the pat frisk that Naegele performed before placing him in his patrol car.  Specifically, I conclude from Naegele's testimony (Tr.A 42-43, 134-35) that the frisk was permissible as a consensual Fourth

Amendment search.[9]  The record shows that when Naegele first asked Algernon for permission to conduct a pat frisk, Algernon responded that he wanted to drive away; when Naegele requested permission a second time and explained the purpose of the frisk, Algernon extended and raised his arms to the side, implicitly consenting to the search.  (Tr.A 42-43, 134-35).  *United States v. Drayton*, 536 U.S. 194, 195-96 (2002) (rejecting challenge to pat frisk because defendant had consented to search of his person); *United States v. Bowers*, 490 F. Supp. 2d 285, 293 (D. Conn. 2007) (finding pat frisk performed during traffic stop was lawful pursuant to defendant's consent).  Naegele was likewise permitted to remove the brick of currency that he saw protruding from Algernon's pants pocket after he felt a large bulge.  *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) ("if police are lawfully in a position from which they view an object, if it's incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant").

Although it is unclear whether Naegele's decision to summon a canine unit to the scene delayed the towing of the car, and thus prolonged Algernon's detention in the back of Naegele's patrol car, I find that even if it did, such delay was within the scope of a permissible investigative detention.  By the time that the canine unit had been called, Naegele had determined that Algernon was driving a rental car that neither he nor his passenger was permitted to operate; both had been involved in narcotics activities in the past; both were acting nervously; Algernon provided information of their travel plans that was inconsistent with the rental agreement; and,

---

[9]  The pat frisk also appears justified under *United States v. McCargo*, 464 F.3d 192, 199-202 (2d Cir. 2006), *cert. denied*, 128 S. Ct. 645 (2007), which permits law enforcement officers to conduct a pat search of individuals to be lawfully transported in the rear of a police car where, as here, the search is required by department policy.  *See* Tr.A 42.

both had large sums of currency on their person.  Under those circumstances, a brief delay to summon a canine unit to inspect the car for the presence of narcotics was reasonable and within the scope of a *Terry* stop.  *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005) ("the use of a well-trained narcotics-detention dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests"); *United States v. Glover*, 957 F.2d 1004, 1013 (2d Cir. 1992) ("detaining [defendant] for approximately thirty minutes with his bags to conduct brief questioning and to await the arrival of the narcotics dog was a limited intrusion on [defendant's] Fourth Amendment interests wholly justified by reasonable suspicion").

Finally, I conclude that the detention of Algernon at the station house before he was released also was justified.  During that period, Naegele and other officers prepared the warrant application, traveled to the issuing judge's home, awaited his review and approval of the application, returned to the station, executed the warrant and inventoried the items returned to Algernon and Maldinado.  (Tr.A 56-60; Tr.C 202-04, 208).  Considering the amount of work that occurred over the nearly five and one-half hours during which Algernon was held at the station, I do not find that the length of detention exceeded the bounds of a permissible investigative detention.  Rather, I find that the officers diligently conducted their investigation in an effort to confirm or dispel their suspicions that Algernon was involved in narcotics-related activity – suspicions that were plainly reasonable based upon the canine alerts to the car.  Under these circumstances, I find that Algernon's detention did not "involve any delay unnecessary to a legitimate investigation."  *Sharpe*, 470 U.S. at 687.  *See*, *e.g.*, *United States v. Montoya de Hernandez*, 473 U.S. 531, 542-44 (1985) (sixteen-hour investigative detention during which defendant was held in airport security room was not unreasonable where he had been suspected

of swallowing balloons containing cocaine); *Diesel v. Town of Lewisboro*, 232 F.3d 92, 106-07

(2d Cir. 2000) (six-hour investigative detention reasonable where defendant, a New York State

Trooper whose responsibilities involved driving the lieutenant governor, was discovered to have

passed out in a car with the engine running and a bottle of wine in the back seat and blood on his

nose and face); *see also Adams v. Williams*, 407 U.S. 143, 145 (1972) ("[t]he Fourth Amendment

does not require a policeman who lacks the precise level of information necessary for probable

cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape").

Finally, even if Algernon's investigative detention was not justified and tainted

the search warrant, I find that the $42,000 inevitably would have been discovered in the trunk of

the car pursuant to a valid inventory search.  The inevitable discovery exception to the

exclusionary rule "allows evidence initially detected as the result of unlawful government

conduct to be introduced nonetheless 'if the prosecution can establish by a preponderance of the

evidence that the information ultimately or inevitably would have been discovered by lawful

means.'" *United States v. Whitehorn*, 829 F.2d 1225, 1230 (2d Cir. 1987) (quoting *Nix v.

Williams*, 467 U.S. 431, 444 (1984)), *cert. denied*, 487 U.S. 1237 (1988).  In applying this

exception, the court must determine, "viewing affairs as they existed at the instant before the

unlawful search, what would have happened had the unlawful search never occurred." *United

States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992).  "[P]roof of inevitable discovery 'involves no

speculative elements but focuses on demonstrated historical facts capable of ready verification or

impeachment and does not require a departure from the usual burden of proof at suppression

hearings.'" *Id*. (quoting *Nix v. Williams*, 467 U.S. at 444).  As the Supreme Court explained in

*Nix*:

> [T]he interest of society in deterring unlawful police conduct and
> the public interest in having juries receive all probative evidence of
> a crime are properly balanced by putting the police in the same, not
> a *worse*, position than they would have been in if no police error or
> misconduct had occurred.

*Nix*, 467 U.S. at 443.

In this matter, Naegele testified that he initially decided to impound the rental car upon his determination that neither Algernon nor Maldinado were authorized to drive it and that Budget requested its towing. (Tr.C 209). *See United States v. Little*, 945 F. Supp. 79, 84 (S.D.N.Y. 1996) (officers permitted to impound rental car in order to return it to rental company and to perform inventory search because no occupants of vehicle were authorized to drive it), *aff'd*, 133 F.3d 908 (2d Cir. 1998). In other words, his testimony makes clear that the car would have been towed to the police station even if the decision to seek a warrant had not been made. Willoughby Hills Police Department policies and procedures require that when a vehicle is towed for any reason, the officer directing such towing must perform an inventory search of the vehicle. (Tr.C 213-14; G.Ex. 16). The purpose of this policy is to protect the police department and the towing company from potential liability for claims of theft or property damage. (Tr.C 214). Naegele testified that in accordance with this policy, he would have inventoried the contents of the car, including the contents of the trunk of the vehicle and any bags found therein, in connection with its towing. (Tr.C 217-19). Naegele further testified that upon discovering the currency in the bags in the trunk, he would have counted it and recorded the amount prior to either returning or safeguarding the money. (Tr.C 219-21). Based upon this testimony, I further find that the currency in the car inevitably would have been discovered pursuant to an inventory search in accordance with established policies and procedures of the department. *See United*

*States v. Mendez*, 315 F.3d 132, 138 (2d Cir. 2002) (to apply inevitable discovery doctrine on the

basis of inventory search procedures, government must demonstrate "that the police had

legitimate custody of the vehicle . . . being searched . . . ; that when the police in the policy

agency in question conducted inventory searches, they did so pursuant to 'established' or

'standardized' procedures . . . ; [and,] that those inventory procedures would have inevitably led

to the 'discovery' of the challenged evidence") (citations omitted).

In sum, for the reasons set forth above, I recommend that the district court deny

Algernon's motion to suppress evidence seized from both his person and the Ford Taurus

following the traffic stop.

**B.  Statements Made by Algernon Toole:**  Algernon also moves to suppress

statements made by him during the initial traffic stop and after he was transported to the

Willoughby Hills Police Station.  As established by the Supreme Court, statements made during

custodial interrogation are generally inadmissible unless a suspect first has been advised of his

rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court

held that the prosecution may not use a defendant's statements that are the product of custodial

interrogation unless it demonstrates that the defendant first was warned of his Fifth Amendment

privilege against self-incrimination and then voluntarily waived that right.  *Id.* at 444.  Here,

while the government concedes that Algernon was interrogated, it disputes that such

interrogation occurred while he was in custody.  (Docket # 120).

As framed by the Second Circuit,

[c]ustodial interrogation exists when a law enforcement official
questions an individual and that questioning was (1) conducted in
custodial settings that have inherently coercive pressures that tend

30

> to undermine the individual's will to resist and to compel him to
> speak (the in custody requirement) and (2) when the inquiry is
> conducted by officers who are aware of the potentially
> incriminating nature of the disclosures sought (the investigative
> intent requirement).

*United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (citing *United States v. Morales*,

834 F.2d 35, 38 (2d Cir. 1987)) (internal citations omitted).

The test for determining whether a defendant was "in custody" involves a two-part

analysis. First, the court must consider whether a reasonable person in defendant's position

would have felt free to leave. *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004). If so,

the court must then determine "whether a reasonable person in defendant's position would have

understood himself to be subjected to the restraints comparable to those associated with a formal

arrest." *Id*. at 671 (quoting *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995)). According

to the Second Circuit:

> Because seizure is a necessary prerequisite to *Miranda*, *see*, *e.g.*,
> *Oregon v. Mathiason*, 429 U.S. [492, 495 (1977)] [], it makes
> sense for a court to begin any custody analysis by asking whether a
> reasonable person would have thought he was free to leave the
> police encounter at issue. If the answer is yes, the *Miranda* inquiry
> is at an end; the challenged interrogation did not require advice of
> rights. On the other hand, if a reasonable person would not have
> thought himself free to leave, additional analysis is required
> because, as *Berkemer v. McCarty*, 468 U.S. [420, 439-40 (1984)]
> [], instructs, not every seizure constitutes custody for purposes of
> *Miranda*. *Cf. Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991)
> ("[I]t is not enough to say a person has been *arrested* simply
> because, due to police action, he reasonably believes he is not free
> to leave.") In such cases, a court must ask whether, in addition to
> not feeling free to leave, a reasonable person would have
> understood his freedom of action to have been curtailed to a degree
> associated with formal arrest. *See California v. Beheler*, 463 U.S.
> [1121, 1125 (1983)] []; *see also Stansbury v. California*, 511 U.S.
> [318, 322 (1994)] []. Only if the answer to this second question is

> yes was the person "'in custody' for practical purposes," and
> "entitled to the full panoply of protections prescribed by *Miranda*."
> *Berkemer v. McCarty*, 468 U.S. at 440 [].

*United States v. Newton*, 369 F.3d at 672.

In addition, "'[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Interrogation includes direct questioning, as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect," *Rhode Island v. Innis*, 446 U.S. at 301, or that would "produce psychological pressures that [would] subject the individual to the 'will' of his examiner." *United States v. Morales*, 834 F.2d at 38 (citations omitted). *See also United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992); *United States v. Thomas*, 961 F. Supp. 43, 44-45 (W.D.N.Y. 1997).

With respect to the statements made by Algernon on the shoulder of the thruway during the initial traffic stop, I find that he was not in custody and that no *Miranda* warnings were required. Although no *per se* rule exists exempting traffic stops from the reach of *Miranda*, *see*, *e.g.*, *United States v. Newton*, 181 F. Supp. 2d 157, 170 (E.D.N.Y. 2002) ("Supreme Court did not adopt a bright-line rule that *Miranda* warnings are never required during [traffic] stops") (citing *Berkemer v. McCarty*, 468 U.S. 420, 440-42 (1984)), routine traffic stops generally do not constitute custodial settings. *See Berkemer v. McCarty*, 468 U.S. at 440-42 (the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*"); *Newton*, 369 F.3d at 669 (acknowledging *Berkemer* holding that routine traffic stops do not constitute custodial detentions

for purposes of *Miranda*); *United States v. Fernandez-Jimenez*, 2004 WL 1598653 at *5 ("[a]lthough motorists do not feel free to leave, traffic stops are not a form of custodial interrogation because they are brief and public") (citation omitted); *United States v. Perez*, 2002 WL 1835601, *6 (S.D.N.Y. 2002) ("persons temporally detained pursuant to [traffic] stops are not 'in custody' for the purposes of *Miranda*") (citation omitted).

Here, as already described, Naegele performed a lawful traffic stop of the Taurus driven by Algernon based upon two observed traffic violations (following too closely and weaving). Naegele asked for identification, which Algernon provided, along with a rental agreement for the car. (Tr.A 21, 24). Because the agreement did not list Algernon or Maldinado as authorized operators of the Taurus, Naegele questioned Algernon about the vehicle and his travel plans. This initial questioning by Naegele was brief in duration and occurred along a public thruway. Applying the above-cited authority, I find that Algernon was not in custody during the traffic stop and that his motion to suppress statements made at that time should be denied.

I reach the opposite conclusion with respect to several of the statements made by Algernon at the police station. At the police station, following the execution of the search warrant for the Ford Taurus, Naegele again spoke to Algernon.[10] Algernon was presented with the property seized from the Taurus and asked to identify those items that belonged to him. (Tr.A 65-66). As this process occurred, Naegele also asked Algernon various pedigree questions,

---

[10] The government has represented that it does not seek to introduce any statements made by Algernon while seated in the back of Naegele's patrol car. (Docket # 120 at 46 n.12).

including his name, address and telephone number.  (G.Ex. 7).  Once Algernon identified his

personal property, a receipt was created and the property was returned.[11]  (Tr.A 67; G.Ex. 5).

An oft-invoked exception to the *Miranda* requirement exists for questions relating

to general pedigree information.  Under this "pedigree exception," the "solicitation of

information concerning a person's identity and background does not amount to custodial

interrogation prohibited by *Miranda* . . . whether the solicitation occurs before . . . or after

*Miranda* warnings are given."  *United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988)

(citations omitted).  The pedigree exception includes "routine booking question[s]" designed to

elicit "biographical data necessary to complete booking or pretrial services."  *Pennsylvania v.*

*Muniz*, 496 U.S. 582, 601 (1990).  The pedigree exception does not, however, include questions

designed to elicit incriminating admissions.  *Id*. at 602 n.14; *see also Innis*, 446 U.S. at 301.

Here, the majority of the questions posed to Algernon at the police station

concerned his biographical information and thus fall within the pedigree exception.  Outside the

scope of that exception, however, are those questions in which Algernon was directed to identify

which items of the personal property seized from the Taurus belonged to him.  As described

above, a substantial amount of cash was discovered hidden inside shoes located in two bags

found in the trunk of the Taurus.  (Tr.A 62; G.Ex. 4).  By asking Algernon to identify the shoes

as his personal property, the officers elicited statements connecting him to the currency as well.

Although these inquiries may have been necessary to return Algernon's property to him, the

officers should have known their questions were likely to elicit incriminating responses.  Indeed,

---

[11]  An additional receipt was issued for the money seized from Algernon's person, but the money was not
returned to him.  (Tr.A 71-72, 150; G.Ex. 6).

the government concedes that the questions posed to Algernon were the functional equivalent of an interrogation, but argues that the responses should be admissible because Algernon was not in custody at the time.  (*See* Docket # 120 at 46-47).  I disagree.

As noted, the test for determining whether a defendant is in custody is whether he or she would have felt free to leave or whether a reasonable person would have understood himself to be subjected to restraints comparable to a formal arrest.  Here, Algernon was removed from his car, a large amount of currency was removed from his pockets and he was taken to the police station and secured pending the results of a search of the vehicle.  Specifically, he was placed in an interview room that was located in a locked and secured area of the police station, preventing Algernon from leaving.  (Tr.A 146).  Following that sequence of events, Algernon was asked to identify his belongings as they were displayed on the floor of the police station, and only after that questioning was Algernon advised that he was going to be released.  (Tr.A 72). Under these circumstances, I find that a reasonable person would not have felt free to leave at the time of the questioning and would have believed himself restrained to the degree of an arrest.  I therefore recommend that Algernon's statements identifying property belonging to him be suppressed, but that his pedigree responses be admitted if offered.

C.  **Photographic Identification of Algernon Toole**:  Finally, Algernon seeks to suppress evidence relating to a confidential informant's identification of a photograph of him. (Docket # 71).  An out-of-court photographic identification will be suppressed under the Due Process Clause if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Simmons v. United States*, 390 U.S. 377, 384 (1968); *see also Stovall v. Denno*, 388 U.S. 293, 301-02 (1967).

In determining whether to exclude a pretrial identification, the court must undertake a two-step analysis.  First, the court must consider whether the identification procedure was unduly suggestive.  If so, the court then must determine whether the identification nevertheless possesses "sufficient aspects of reliability."  *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. 98, 109-17 (1977)), *cert. denied*, 434 U.S. 872 (1977).  "Even if the procedure was unnecessarily (or impermissibly) suggestive, therefore, a district court may still admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'"  *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

At the government's request, this Court conducted a bifurcated *Wade* hearing.[12] To date, the government has offered evidence relating only to the issue of the suggestiveness of the identification procedure utilized.  No continuation of the hearing is necessary if the Court finds the identification procedure was not unduly suggestive.  If, to the contrary, the Court finds the procedure was impermissibly suggestive, a continuation of the hearing would be warranted to determine whether the witness who made the identification had an independent basis upon which to do so.

The identification procedure at issue in this case occurred on November 23, 2004, when Sindoni and Fickett interviewed a confidential informant who had previously provided information to them relating to narcotics trafficking activity by a black male named Algernon.

---

[12]  A *Wade* hearing refers to a hearing held pursuant to *United States v. Wade*, 388 U.S. 218 (1967), to determine whether an out-of-court identification resulted from an impermissibly suggestive procedure and, if so, whether it is independently reliable.

(Tr.A 171-72, 174-75).  During the meeting, the informant was questioned about Algernon and others and then presented with a six-photograph array and asked whether he knew any of the individuals depicted.  (Tr.A 176, 187).  Within moments, the informant identified the photograph of Algernon and the individual whom he knew as "Al."  (Tr.A 177).  Pursuant to Sindoni's instructions, the informant circled the photograph and initialed it.

I find that the procedure in question was not suggestive.  The informant was shown a six-photograph array, rather than a single photograph, and asked only to identify anyone whom he recognized.  The informant identified the photograph of Algernon and the name by which he was known to him.  Algernon's photograph, like the others in the array, was a frontal image from the shoulders to the top of his head.  All of the men depicted appeared to be of similar age and coloring and had relatively short hair and similar facial hair (moustache and beard).  (G.Ex. 8).  *See United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990) ("fairness of a photograph array depends upon number of factors, including the size of the array, the manner of presentation by the officers, and the array's contents"), *cert. denied*, 501 U.S. 1233 (1991); *United States v. Marrero*, 705 F.2d 652, 655 n.5 (2d Cir. 1983) (six is an acceptable number for a photographic array); *United States v. Joseph*, 332 F. Supp. 2d 571, 582 (S.D.N.Y. 2004) (photographic array was not unduly suggestive where array contained six photographs of individuals of similar ethnicity, age, hairstyle and facial hair).  *See also United States v. Thai*, 29 F.3d 785, 808 (2d Cir.) ("principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit'") (quoting *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986)), *cert. denied*, 513 U.S. 993 (1994).

On this record, I find that the photographic identification procedure was not impermissibly suggestive.  I thus recommend that Algernon's motion to suppress the photographic identification be denied without resort to the second stage of the *Wade* hearing.

## II.  Everette Toole's Motion to Suppress

Everette moves to suppress evidence seized from his person and from the Dodge Magnum at the time of his arrest on February 15, 2006.  He also moves to suppress statements made by him following his arrest.  (Docket # 70).

A.  **Motion to Suppress Physical Evidence:**  Everette contends that the agents violated his constitutional rights when they seized his wallet and cellular telephone from his person following his arrest.  (Docket ## 70, 135).  The government contends that these items were properly seized from Everette as part of a search incident to his arrest.  (Docket # 129).  To resolve the dispute, this Court must determine whether the agents had sufficient probable cause to arrest Everette and, if so, whether he was properly searched incident to that arrest.

"In general, probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989) (citations omitted).  "Probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  In assessing probable cause, the Court must view the "totality of the circumstances" as they existed at the time of the arrest, "weighed not in terms of library analysis by scholars, but as understood

by those versed in the field of law enforcement."  *Id.* at 231-32.  Moreover, "where law

enforcement authorities are cooperating in an investigation, . . . the knowledge of one is

presumed shared by all."  *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983) (citing *Whiteley v.

Warden*, 401 U.S. 560, 568 (1971)).

   In this case, I easily conclude from the credible evidence summarized above that

probable cause existed to believe Everette was involved in narcotics trafficking crimes at the

time he was arrested.  In sum, that evidence – which is described in significant detail at pages

10-15 *supra* – consisted of numerous telephone conversations and meetings between and among

the CS, Wiesensel and Algernon, to arrange the sale by "E" (whom the CS knew from previous

dealings to be Algernon's brother, Everette) to the CS of five to seven kilograms of cocaine at a

price of $23,000 per kilogram; a video and audio recorded meeting between the CS and Everette

on February 12, 2006 in which they discussed arrangements for the deal; a meeting between the

CS and Everette on February 14, 2006 in which the CS provided $23,000 to Everette to purchase

one kilogram of cocaine; a meeting approximately an hour later during which the CS received

one kilogram of cocaine, which he turned over to supervising agents; and, a final meeting several

minutes later in which the CS entered Everette's car with a bag containing $125,000 and exited

moments later without the bag.  In my view, this evidence amply justified Everette's arrest.

   Having found that Everette's arrest was lawful, I also find that the seizure of his

wallet and cell phone were justified.  Upon a lawful arrest, the arresting officer may search the

arrestee for weapons or for evidence of the suspected crime.  *United States v. Robinson*, 414 U.S.

218, 225-26 (1973); *Chimel v. California*, 395 U.S. 752, 762-63 (1969); *United States v.

Campbell*, 959 F. Supp. 606, 611 (W.D.N.Y. 1997), *aff'd*, 152 F.3d 921 (2d Cir. 1998).  Here,

Everette was searched immediately upon his arrest and the seizure of his wallet and cell phone as evidence was proper.  I therefore recommend denial of Everette's motion to suppress the wallet and cellular telephone seized from him at the time of his arrest.[13]

As to the recovery of the bag of money, another telephone, the car keys and the registration from the interior of the Dodge Magnum, the government has offered several legal theories to justify these seizures.  (Docket # 129).  Unfortunately, the record developed at the hearing does not permit me to determine confidently the precise timing of the recovery of the various items of evidence beyond finding generally that the recovery of the bag of currency occurred before the car was searched leading to the discovery of the other evidence.  Although the search of the car apparently took place after the arresting agents relinquished custody of Everette to other agents, the testimony is unclear whether the search began when Everette was still outside or inside the hotel.  (Tr.B 123, 296, 298).  Even if he was outside, however, the agents testified that he was approximately fifty yards away (Tr.E 297, 299), rendering the search incident to arrest exception inapplicable, as the government concedes.  *See Thorton v. United States*, 541 U.S. 615, 622 (2004) (arrestee's "temporal" and "spatial" proximity to automobile relevant to question whether officer justified in searching interior of car in which arrestee had been "recent occupant").  Because the testimony is also unclear as to Everette's location at the time Agent Robinson removed the bag of currency from the car – an event that preceded the search of the car (Tr.B 23-24, 124; Tr.E 290) – reliance on the search incident to arrest exception appears imprudent.

---

[13]  Provided that the seizure of the phone was lawful, Everette does not challenge the subsequent search of its contents.  (*See* Tr.B 102 and Docket # 135).

Nonetheless, I find that the seizure of the evidence from the Magnum was justified under the automobile exception and the inevitable discovery doctrine.[14]  The automobile exception authorizes the warrantless search of a "readily mobile" automobile where there is probable cause to believe that a vehicle contains contraband or other evidence of a crime. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996).  The exception is justified by the "inherent mobility" of the automobile, *id.*, which the Second Circuit has made clear is sufficient to demonstrate the automobile's "ready mobility."  *United States v. Howard*, 489 F.3d 484, 494 (2d Cir.), *cert. denied*, 128 S. Ct. 525 (2007).

Here, the officers had probable cause to believe that evidence of narcotics dealing would be found in the car.  Among other things, they knew that inside the car the CS had provided Everette with over $100,000 to purchase multiple kilograms of cocaine and that the money was still in the car.  They also knew that Everette telephoned the CS from his automobile to summon the CS to the parking lot; the fact that officers had recovered one phone from Everette's person did not foreclose them from searching for others.  In addition, they knew that Everette had provided one kilogram of cocaine to the CS inside the car and that Everette planned to provide the CS with the additional cocaine after receiving the buy money.  Under those circumstances, the officers were justified in searching the car for the presence of additional narcotics, as well as other evidence.

Finally, no question exists that the Magnum was inherently mobile.  It had just been driven by Everette moments earlier and was clearly operable.  That Everette was unlikely to remove it considering his arrest and custody does not render it immobile within the meaning of

---

[14]  I do not reach the question of the applicability of the forfeiture exception.

this exception. *United States v. Howard*, 489 F.3d at 493 ("[w]hether a vehicle is 'readily mobile' within the meaning of the automobile exception has more to do with the inherent mobility of the vehicle than with the potential for the vehicle to be moved from the jurisdiction").

I further find that the evidence taken from the car inevitably would have been discovered. As discussed above, the inevitable discovery exception allows the introduction of evidence that was improperly obtained if the government can demonstrate that it would have been discovered independently through lawful means. *See Nix v. Williams*, 467 U.S. at 444; *United States v. Eng*, 971 F.2d at 861; *United States v. Whitehorn*, 829 F.2d at 1230. Here, Agent Williams testified that because the Dodge Magnum had been used as an instrument of a narcotics transaction, he and other agents decided to seize the vehicle in order to pursue an asset forfeiture proceeding. (Tr.E 302). According to Williams, had the car not been searched at the time of Everette's arrest, he would have conducted a full inventory search of the interior of the vehicle pursuant to standard FBI policies and procedures before securing the vehicle. During such a search, Williams further testified, the currency, phone, keys and registration would have been discovered and removed for safe-keeping. (Tr.E 306). In addition, the evidence also would have been discovered and removed during the inventory search performed in connection with the return of the car to its owner, a search which was also mandated by FBI procedures. (Tr.D 145, 155; Tr.E 309, 313).

Based upon the credible testimony, I find even if the evidence had been improperly retrieved from the Dodge Magnum shortly after Everette's arrest, it would have been discovered inevitably during either of the routine inventory searches. *See Illinois v. Lafayette*, 462 U.S. 640, 643 (1983) ("inventory search[es] constitute[] a well-defined exception to the

warrant requirement") (citations omitted); *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993) (holding that proceeds of an unjustified search incident to a legal arrest may still be admitted where they would inevitably have been discovered in a permissible inventory search"). Accordingly, it is my recommendation that Everette's motion to suppress be denied.

B. **Motion to Suppress Statements:**   Everette also moves to suppress post-arrest statements he made to the agents.  (Docket ## 70, 135).  I find that suppression should be denied because Everette was properly advised of his *Miranda* warnings and validly waived those rights before making any statements.

Immediately after his arrest, Everette was escorted to a hotel room, where he was seated on a sofa, his handcuffs were removed and he was offered a drink and the use of a restroom.  (Tr.B 25).  He was advised about the investigation and the potential benefits of cooperation.  Although this exchange occurred before *Miranda* warnings were administered, Everette was nonetheless advised not to respond, and he made no statements during this initial interaction.  (Tr.B 26-27; Tr.D 223-26).

Rather, the statements the government seeks to use were made after Agent Robinson advised Everette of his *Miranda* rights by reading them from an FBI rights card and after Everette communicated his desire to waive his rights and speak.  (Tr.B 29, 71; Tr.D 27; G.Ex. 8).  Robinson ensured that Everette spoke and understood English and appeared calm and not influenced or intoxicated by drugs or alcohol.  Nothing in the record suggests that Everette was mistreated by the agents or that his will was overborne by the circumstances; indeed, he was permitted to telephone his wife to discuss with her the decision whether to cooperate.  (Tr.B 36, 80).  No threats were made to induce Everette to speak, and although Everette was told that he

43

might be allowed to go home if he cooperated – which did not in fact occur – I find that such statements did not amount to coercive promises. *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ("statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive"), *cert. denied*, 516 U.S. 1182 (1996); *United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989) (agents "[are] free to discuss with [a defendant] the evidence against him and the reasons why he should cooperate"), *cert. denied*, 493 U.S. 1081 (1990); *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987) ("a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials") (citations omitted). The agents truthfully advised Everette that they could not promise that he would be released because they did not have the authority to make the decision; moreover, the record reveals that the agents who met with Everette indeed recommended to the supervisors that he be released.

On this record, I find that Everette knowingly and voluntarily waived his *Miranda* rights. *See United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (to establish valid waiver, government must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right,") (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). I thus recommend denial of Everette's motion to suppress statements he made to the agents following his arrest.

III.  **Dismissal of Indictment**

Both defendants move to dismiss the Second Superseding Indictment for facial and evidentiary insufficiency, for allegedly improper grand jury instructions and voting irregularities and for lack of jurisdiction.  (Docket ## 70, 71).  In addition, Algernon and Everette have submitted several *pro se* motions asserting additional grounds for dismissal.  (Docket ## 85, 86, 87, 91).  Each of the motions will be discussed in turn.

A.  **Dismissal of Indictment on its Face:**  In identical three-sentence arguments, both defendants allege that the Second Superseding Indictment must be dismissed because it fails to set forth a "plain, concise and definite written statement of the essential facts constituting the offense charged."  (Docket ## 70, 71) (citing Fed. R. Civ. P. 7(c)(1)) (emphasis in original).  To the contrary, the indictment alleges each of the elements of the crime charged against both defendants and comports with the requirements of Rule 7(c)(1) of the Federal Rules of Criminal Procedure.  *See United States v. Bagaric*, 706 F.2d 42, 61 (2d Cir. 1983) (indictment is sufficient on its face where it "track[s] the language of the statute").  Thus, this Court recommends that defendants' motions to dismiss the Second Superseding Indictment on its face be denied.

B.  **Evidentiary Insufficiency:**  Defendants also argue summarily that the Second Superseding Indictment should be dismissed based upon insufficiency of the evidence.  (Docket ## 70, 71).  It is well-established that an indictment that is valid on its face, as is the case here, cannot be dismissed on the ground that it is based on inadequate or insufficient evidence.  *United States v. Williams*, 504 U.S. 36, 54 (1992); *United States v. Calandra*, 414 U.S. 338, 345 (1974); *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir. 1989), *cert. denied*, 493 U.S. 1081 (1990).  Instead, the time to advance such a motion is after the government has presented its case

at trial. *See*, *e.g.*, *United States v. Gambino*, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992); Fed. R. Crim. P. 29(a).

Applying the above-cited authority, it is my recommendation that defendants' motions to dismiss on the grounds of evidentiary insufficiency be denied without prejudice.

**C.** **Grand Jury Instructions and Voting Irregularities:**   Algernon and Everette have advanced identical arguments that dismissal is warranted based upon allegedly improper grand jury instructions and a speculative belief that a number of grand jurors who voted to return the Second Superseding Indictment may not have been present during the entire presentation of evidence before the grand jury.  (Docket ## 70, 71).  This Court recommends that this motion also be denied.

With respect to defendants' challenge to the instructions given to the grand jury, "there is no requirement that federal grand jurors be instructed on the law." *United States v. Hernandez*, 2001 WL 1344832, *17 (W.D.N.Y. 2001) (citing *United States v. Zangger*, 848 F.2d 923, 925 (8th Cir. 1988); *United States v. Kenny*, 645 F.2d 1323, 1347 (9th Cir.), *cert. denied*, 452 U.S. 920 (1981)).  Moreover, defendants' motion is based upon nothing more than the speculative assertion that the grand jury minutes will reveal some deficiency in the instructions. Hope and speculation are wholly insufficient to overcome the rule of secrecy in grand jury proceedings that is embodied in Fed. R. Crim. P. 6(e).  *See*, *e.g.*, *United States v. Jailall*, 2000 WL 1368055, *2 (S.D.N.Y. 2000) (the rule of secrecy, which can only be overcome by a showing by the defendant that grounds exist to dismiss the indictment based upon matters that occurred in the grand jury, applies to legal instructions provided to the grand jury); *United States v. Olin Corp.*, 465 F. Supp. 1120, 1134-35 (W.D.N.Y. 1979) (mere conjecture that some

irregularities occurred in the grand jury does not support an inquiry into the proceeding that led

to the indictment).  In addition, an indictment need not be dismissed where some of the jurors

who voted to return the indictment were not present to receive all the evidence, as long as a

quorum of grand jurors was present at all proceedings.  *United States ex rel. McCann v.

Thompson*, 144 F.2d 604, 607 (2d Cir.) (Hand, J.), *cert. denied*, 323 U.S. 790 (1944).  *See also

United States v. Byron*, 994 F.2d 747, 748 (10th Cir. 1993); *United States v. Overmyer*, 899 F.2d

457, 465 (6th Cir.), *cert. denied*, 498 U.S. 939 (1990); *United States v. Godoy*, 678 F.2d 84, 86

(9th Cir. 1982), *cert. denied*, 464 U.S. 959 (1983); *United States v. Pastor*, 419 F. Supp. 1318,

1328-29 (S.D.N.Y. 1975).

   Accordingly, I also recommend denial of defendants' motions to dismiss the

indictment on the basis of speculative claims of voting irregularities and improper instructions.

   **D.  _Pro Se_ Motions:**  In their final challenges, both Algernon and Everette have

submitted several *pro se* motions to dismiss based upon a lack of federal jurisdiction and

violations of their due process and speedy trial rights.  (Docket ## 85, 86, 87, 91).  Although

difficult to comprehend, their arguments have been carefully reviewed by this Court.  For the

reasons discussed below, the motions lack merit.

   This Court's jurisdiction over this matter arises under 18 U.S.C. § 3231, which

provides:  "The district courts of the United States shall have original jurisdiction, exclusive of

the court of the States, of all offenses against the laws of the United States."  The defendants

have been charged by an indictment returned by a federal grand jury for violations of 21 U.S.C.

§ 846, a federal statute.  This case, therefore, lies squarely within this Court's federal jurisdiction.

I have also considered defendants' speedy trial challenge and find it to be unsupported by the record.  Although there have been various periods of delay in this matter since the filing of the indictment, the majority of those periods have been attributable to the defendants' filing of various pretrial motions.  I further find that any remaining periods excluded under the Speedy Trial Act – including a sixty-day exclusion to resolve these motions, which necessitated five days of testimonial hearings – have been properly excluded.  In short, I find that neither the Speedy Trial Act, nor the Due Process Clause, has been violated by any delays in the prosecution.

Finally, defendants' due process challenge, which essentially raises an entrapment defense, is premised upon various factual assertions more appropriately raised at trial.  Accordingly, it is my recommendation that defendants' *pro se* motions to dismiss be denied.


## ALGERNON'S MOTION FOR PRETRIAL RELEASE

By written application, counsel for Algernon filed a motion for reconsideration of this Court's Order detaining Algernon pending trial (Docket # 137)[15], and this Court held a hearing on the motion and reserved decision.  (Docket # 141).  Having reconsidered my original decision, the basis of which I explained in open court (Docket # 58), I adhere to my original decision for the reasons explained at the time.  I further conclude that the length of Algernon's

---

[15]   The magistrate judge before whom Algernon appeared at his initial appearance in the district of arrest (the Southern District of Indiana) set conditions of release.  (Docket # 4).  That decision was reversed by United States District Judge Michael A. Telesca, finding that Algernon should be detained both as a serious risk of flight and danger to the community.  (Docket # 20).  Algernon thereafter moved for reconsideration of that decision, and Judge Telesca referred the motion to the undersigned for determination.  (Docket # 43).  I reached an independent determination that Algernon should be detained pending trial (Docket # 58) – the decision that Algernon now seeks me to reconsider and vacate.

pretrial detention, which I find has not violated the Speedy Trial Act, does not warrant release under the Due Process Clause. *See United States v. Orena*, 986 F.2d 628, 630-32 (2d Cir. 1993).

Now that discovery is complete, defendants' motions have been filed, arguments and hearings have been held thereon, and this opinion has issued, the prospect of a further period of extended pretrial detention is unlikely. Accordingly, Algernon's motion for release pending trial is denied.

## CONCLUSION

For the foregoing reasons, it is hereby Ordered that defendants' motions for disclosure of the identities of the confidential informants **(Docket ## 70, 71)** are **DENIED**, that Everette Toole's motion for severance **(Docket # 70)** is **DENIED** and that Algernon Toole's motion for release pending trial **(Docket # 137)** is **DENIED**. In addition, it is my recommendation that both defendants' motions to suppress physical evidence **(Docket ## 70, 71)** be **DENIED.** Also, it is my recommendation that Everette Toole's motion to suppress statements **(Docket # 70)** be **DENIED** and that Algernon Toole's motion to suppress statements **(Docket # 71)** be **GRANTED in PART and DENIED in PART**. It is my further recommendation that defendants' motions to dismiss the Indictment **(Docket ## 70, 71, 85, 86, 87, 91)** be **DENIED**.

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
January   11   , 2008

49

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[16]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**


 _s/Marian W. Payson_
 MARIAN W. PAYSON
 United States Magistrate Judge

Dated: Rochester, New York
 January  11  , 2008

---

[16]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).